UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO.: |
| SAMUEL SCOTT SALYER<br>MELISSA RENEE SALYER | 05-14253 |
| DEBTORS | |
| SAMUEL SCOTT SALYER<br>MELISSA RENEE SALYER<br>    PLAINTIFFS | ADV. NO.:<br><br>05-1177 |
| V. | |
| SALLIE MAE SERVICING CORPORATION<br>    DEFENDANT | |

AMENDED MEMORANDUM OPINION

Codebtors Samuel Scott Salyer and Melissa Renee Salyer filed chapter 7 on October 16, 2005.  Before the filing, they had incurred substantial student loan debts.[1]  By early 2006, Samuel's outstanding student loan balance was $50,149.16.[2]  Melissa owed $63,932.40.[3]

The debtors sued for a determination that their educational loans were dischargeable pursuant to 11 U.S.C. §523(a)(8).[4]  Initially named as defendants were Sallie Mae, ED Federal

---

[1] The litigants agree that their debt is for an educational loan made, insured or guaranteed by a governmental unit, or made under a program funded in whole or in part by a governmental unit or non-profit institution.  Trial stipulations, paragraph 4.  Thus, the obligations presumptively are nondischargeable pursuant to the version of 11 U.S.C. §523(a)(8) applicable to cases filed before October 17, 2005, the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").

[2] Trial stipulations, paragraph 9.

[3] Trial stipulations, paragraph 8.

[4] Because the debtors' bankruptcy case commenced before the effective date of the 2005 changes to the United States Bankruptcy Code, the pre-BAPCPA version of 11 U.S.C. §523(a)(8) is applicable to this complaint.  Although Congress in BAPCPA changed the wording of §532(a)(8), the statute's substance did not change, and student loan debts remain non-dischargeable unless repayment imposes an undue hardship on the debtor and his dependents.

and Southeastern Louisiana University ("SLU").  Educational Credit Management Corporation ("ECMC"), the holder of the notes, intervened as the defendant.

## FACTS

Samuel and Melissa Salyer married in October 1997.  Mrs. Salyer received a bachelor's degree from Southeastern Louisiana University in 2004.  Mr. Salyer attended Southeastern Louisiana University and Louisiana Technical College intermittently for nearly seven years, but ended his studies without obtaining a degree.  He testified without corroboration that at an early age he had been diagnosed as having a learning disability.

Melissa Salyer gave birth to triplets on March 21, 2005, seven months before filing bankruptcy.  The debtors' three daughters were born twelve weeks before their expected due date, and all have disabilities[5] for which they receive monthly Supplemental Security Income ("SSI") totaling $1809.[6]

Melissa Salyer is a claims adjuster for SIF Consultants.  Her annual salary is $28,000.  Samuel Salyer was not working outside the home at the time of trial, though he receives $1091 each month from the government for an unspecified service-connected disability.  He spends his days caring for the three children, who were just over fourteen months old on the date of trial.  In addition to feeding and changing the children, he attends to their heart monitors, breathing equipment and their other physical needs.  He also takes the children to doctors' appointments.

Mr. Salyer has an unimpressive work history.  He received his G.E.D. in 1989.  After serving in the United States Army, he was a student worker while attending college; worked

---

[5] The plaintiffs did not offer any expert testimony regarding the children's conditions, or whether their conditions will affect their development as they grow up.

[6] The debtors received SSI of $603.00 per month per child, at the time of trial.

2

briefly at Baton Rouge General Hospital; and briefly held a job at a fast food restaurant before being terminated. He testified on cross-examination that he has been unable to find work he could do in the home while also caring for the triplets. He also testified that if he did not care for the children, outside child care could cost $400 per week per child. He also stated that he believes the triplets' SSI benefits and Medicaid eligibility will terminate if either his wife's salary increases significantly or he goes to work outside the home (a belief Mrs. Salyer adopted in her testimony). The Salyers did not offer any independent evidence to corroborate their belief, however.

## LAW AND ANALYSIS

Section 523(a)(8) of the Bankruptcy Code prevents the discharge of student loan debt "unless excepting such debt from discharge … will impose an *undue hardship* on the debtor or the debtor's dependents."[7] (emphasis added). "Undue hardship" is not defined by the Bankruptcy Code.[8] However, the statute requires a showing of "undue" hardship; mere "garden-variety" hardship is insufficient justification for a discharge of student loan debt.[9]

The Fifth Circuit in *Gerhardt* adopted the Second Circuit's *Brunner* test for the "undue hardship" determination under 11 U.S.C. §523(a)(8).[10] *Brunner* and *Gerhardt* allow a debtor to discharge student loan debts if the debtor establishes:

(1) inability to maintain a minimal standard of living for himself and dependents if forced to repay the loans;

---

[7] 11 U.S.C. §523(a)(8).

[8] *Woodcock v. Chemical Bank (In re Woodcock)*, 45 F.3d 363, 367 (10th Cir. 1995).

[9] *United States Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1111 (9th Cir. 1998).

[10] *U.S. Dept. of Education v. Gerhardt (In re Gerhardt)*, 348 F.3d 89 (5th Cir. 2003), adopting *Brunner v. New York State Higher Educational Service Corp. (In re Brunner)*, 831 F.2d 395 (2d Cir. 1987).

3

    (2) additional circumstances indicating that the state of affairs is likely to exist for a significant period; and

    (3) good faith efforts to repay the loans.[11]

The debtor bears the burden of proving all three elements[12] by a preponderance of the evidence.[13] If the debtor fails to prove even one of these, the inquiry ends and the student loan cannot be discharged.[14]

### I. THE DEBTORS DID NOT PROVE THAT REPAYMENT WOULD LEAVE THEM UNABLE TO MAINTAIN A MINIMAL STANDARD OF LIVING FOR THEMSELVES AND THEIR CHILDREN.

*Gerhardt* first directs bankruptcy courts to determine whether a debtor can maintain a minimal standard of living for herself and her dependents based on current income and expenses, if she is forced to repay the student loan.[15] To assess the debtors' request for a discharge, the court must consider:

1. The debtor's present standard of living based upon the debtor's lifestyle attributes which appear from the record; and

2. Whether the forced repayment of the student loan obligation will preclude the debtor from maintaining a minimal standard of living.[16]

Debtors cannot satisfy this test "merely because repayment of [the student loans] would require some major personal or financial sacrifices."[17] *Gerhardt* demands more than a showing of tight

---

[11] *Gerhardt*, 348 F.3d at 91.

[12] *Id.*

[13] *Id.*

[14] *Pennsylvania Higher Education Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 306 (3d Cir. 1995).

[15] *Gerhardt*, 348 F.3d at 92; *Brunner*, 831 F.2d at 396.

[16] *In re Naranjo*, 261 B.R. 248, 254-255 (Bankr. E.D. Cal. 2001).

[17] *In re Elmore*, 230 B.R. 22, 26 (Bankr. D. Conn. 1999), citing *Faish*, 72 F.3d at 306.

finances: it requires that a debtor prove he cannot afford reasonably necessary living expenses if he is forced to repay his student loans. A reasonably necessary living expense for purpose of the analysis is one that the debtor cannot cut from his budget while maintaining a minimal standard of living.[18]

The Salyers argue that they meet the test. They argue that their monthly expenses now exceed by $500 their monthly combined household income of approximately $4700. The debtors also contend that assuming even the most optimistic series of future events (in which the triplets' SSI and Medicaid eligibility is not terminated and the family's expenses do not increase), the Salyers' financial condition inevitably will decline. The record does not support their claims.

First, the Salyers make significant discretionary expenditures. For example, in November 2005 alone, the Salyers made purchases at Major Video and Blockbuster, and "fast food" establishments including Egg Roll King, McDonald's, Subway, Sonic, Burger King, China House, Piccadilly, Raisin' Cane's, CC's Coffee and Taco Bell.[19]

Next, the debtors also have not economized where they could. For instance, every month the Salyers spend $146 for digital cable television and internet access. The debtors also spend an average of $87 a month for unlimited long distance home telephone service through BellSouth, *plus* an average of $146 a month for Sprint cellular phones.[20] Notwithstanding Mr. Salyer's explanations, the dual long distance services are duplicative.[21] Simply by settling for basic cable

---

[18] *In re Savage*, 311 B.R. 835, 841 (1st Cir. B.A.P. 2004), citing *In re Dolan,* 256 B.R. 230, 239 (Bankr. D. Mass. 2000).

[19] In November 2005, the Salyers spent $113.74 on fast food and video rentals alone. (Plaintiffs' Exhibit 8.)

[20] The monthly average is based upon the debtors' payments made to Cox Communications, Bell South and Sprint from December 2005 through March 2006 (Plaintiffs' Exhibit 8).

[21] Mr. Salyer testified that the cell phones were needed in case of a medical emergency. Although this may be understandable considering the children's condition, the Salyers still could economize by using their cell phones to make long distance telephone calls.

5

television and economizing on their telephone service, the Salyers easily could reduce their monthly expenses without foregoing a comfortable quality of life and afford to make some, if not all, of their student loan payments.

The evidence supports a finding that the Salyers have not proven that they cannot afford reasonably necessary living expenses and maintain a minimal standard of living for themselves and their children, if they must repay their student loans.

II. THE SALYERS FAILED TO PROVE THEY MADE GOOD FAITH EFFORTS TO REPAY THEIR STUDENT LOANS

Under *Gerhardt*, the good faith element requires the debtor to show that she "has made good faith efforts to repay [her] loans."[22] Thus bankruptcy courts examine the debtor's "efforts to obtain employment, maximize income, and minimize expenses."[23] The evidence does not support a finding that the debtors have made the good faith effort *Gerhardt* imposes as a condition to the discharge of student loans.

First, Mr. Salyer testified, without corroboration, that he could not find work paying him enough to offset the cost of outside childcare providers. Moreover, Mrs. Salyer does not want to change employers because any increase in income may lead to the termination of the triplets' SSI benefits, and because she does not want to risk loss of her health insurance coverage. But the Salyers offered no evidence supporting a finding that a change of jobs would inevitably lead to the loss of the SSI benefits and hospitalization insurance.[24] It may be that the debtors' beliefs are

---

[22] *Educational Credit Management Corporation v. Frushour (In re Frushour)*, 433 F.3d 393, 402 (4th Cir. 2005) citing *Brunner*, 831 F.2d at 396.

[23] *Frushour*, 433 F.3d at 402, citing *O'Hearn v. Educational Credit Management Corporation (In re O'Hearn)*, 339 F.3d 559, 564 (7th Cir. 2003).

[24] *See Gerhardt*, 348 F.3d at 93, citing *In re Grigas*, 252 B.R. 866, 875 (Bankr. D. N.H. 2000) ("[N]othing in the Bankruptcy Code [requires] that a debtor choose to work in only the field in which he is trained, obtain a low-paying

6

correct: that by obtaining more lucrative employment, Mrs. Salyer will cause the loss of the triplets' SSI benefits and actually leave the household with less income than it now receives. It is also possible that even if Mrs. Salyer found work paying significantly more than she now earns, the new employer's health insurance will not afford coverage for the triplets. However, the evidence on these points – the uncorroborated testimony of the debtors – was not convincing and was uncorroborated by independent evidence.

Elsewhere in this opinion the court addresses the debtors' failure to reduce their discretionary spending.[25] To the extent that the discussion also is appropriate under the rubric of good faith, it is incorporated here.

Perhaps the most compelling indication of the debtors' lack of good faith is their failure to try to renegotiate their student loans. A debtor's effort to seek out loan consolidation options that make the debt less onerous is an important indicator of good faith.[26] "Although not always dispositive, it illustrates that the debtor takes her loan obligations seriously, and is doing her utmost to repay them despite her unfortunate circumstances."[27] For example, the William D. Ford Program[28] offers five different repayment plans to student loan borrowers unable to make

---

job, and then claim that it would be an undue hardship to repay his student loans"); *Frushour*, 433 F.3d at 401 ("Having a low-paying job, however, does not itself provide [sic] undue hardship, especially where the debtor has not actively sought higher-paying employment"). *See also Olyer v. Educational Credit Management Corporation (In re Olyer)*, 397 F.3d 382 (6th Cir. 2005) (affirming lower court's refusal to discharge the student loan debt of a married couple with three children who had annual income of $10,000 when one debtor chose to work as a modestly compensated church pastor).

[25] *See* discussion of the Salyers' discretionary expenditures in Section I, above.

[26] *Frushour*, 433 F.3d at 402, citing *Alderete v. Educational Credit Management Corp. (In re Alderete)*, 412 F.3d 1200, 1206 (10th Cir. 2005).

[27] *Frushour*, 433 F.3d at 402, citing *Tirch v. Pennsylvania Higher Education Assistance Agency (In re Tirch)*, 409 F.3d 677, 682-83 (6th Cir. 2005) (failure to renegotiate student loan obligations is not a *per se* indication of a lack of good faith). *See also United States Dept. of Health & Human Services v. Smitley*, 347 F.3d 109 (4th Cir. 2003) (relying in part on fact that debtor was eligible for income contingent repayment plan to deny discharge under "unconscionable" standard for Health Education Assistance Loans).

[28] 34 C.F.R. § 685 *et seq*.

their contractual payments. Among these, the Income Contingent Repayment Plan ("ICRP") allows reduced student loan payments based upon the federal poverty guidelines, the borrower's adjusted gross income, the total amount of the borrower's loans and her family size.[29]

The debtors did not apply to participate in the ICRP. Although Mr. Salyer testified that he and his wife could not afford the $14.80 monthly payment each would make to participate in the ICRP based upon their monthly income and expenses at the time of trial,[30] the evidence supports a finding that that Mr. and Mrs. Salyer easily could have afforded to participate in the ICRP had they reduced spending on cable television, fast food, movie rentals, long distance telephone calls and movie tickets. Those reductions would not significantly reduce their lifestyle.

The Salyers readily admit that they have not made a single payment on any of their student loan obligations since the debts first came due. Mr. Salyer's testimony suggests that the loans were in deferment before they filed bankruptcy, but the testimony concerning deferment was confusing and incomplete. Mr. Salyer testified that he and his wife called Sallie Mae on numerous occasions claiming that they were entitled to deferment, and that he even contacted the Governor's Office and the Louisiana Attorney General to assist the couple in obtaining deferments. However, Mr. Salyer's testimony is uncorroborated by independent evidence.

To summarize, the debtors' failure to make any payment on their student loan debt, to economize and to seek a reduced payment plan through The William D. Ford Program income contingent repayment plan, in combination demonstrate their lack of good faith.

---

[29] 34 C.F.R. § 685.208(f).

[30] Defendant's Exhibit D-4, p.2.

III. A WORD ABOUT "ADDITIONAL CIRCUMSTANCES"

Because the Salyers have failed to prove their case for a discharge based on two of the three *Gerhardt* elements, the court declines to determine whether the Salyers have satisfied the last element, save in two respects.

*Gerhardt*'s third test is whether "additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans."[31] "Additional circumstances" encompasses "circumstances that impacted on the debtor's future earning potential but which [were] either not present when the debtor [ ] applied for the loans or [have] since been exacerbated."[32] Proving that the debtor is "currently in financial straits" is not enough.[33] Instead, the debtor must specifically prove "a total incapacity ... in the future to pay [his] debts for reasons not within [his] control."[34]

First, the debtors argue that Mr. Salyer obtained no benefit from his education. Consequently, they suggest that because Samuel Salyer lacks skills necessary to obtain sufficient income to make payments on the student loans, it would not be fair to require Ms. Salyer to repay the loans for what essentially is a valueless education. This argument has no merit. "[A] debtor's failure to obtain or to benefit financially from a financed [education] is not a separate mitigating consideration in determining whether [a student loan obligation is] dischargeable."[35]

Second, the debtors point to the challenge of raising their children, who as a result of

---

[31] *Gerhardt*, 348 F.3d at 91; *Brunner*, 831 F.2d at 396.

[32] *Gerhardt*, 348 F.3d at 92, citing *In re Roach*, 288 B.R. 437, 445 (Bankr. E.D. La. 2003).

[33] *Gerhardt*, 348 F.3d at 92, citing *Roach*, 288 B.R. at 445.

[34] *Gerhardt*, 348 F.3d at 92, citing *Faish*, 72 F.3d at 307 (3d Cir. 1995).

[35] *See Rice v. United States (In re Rice)*, 78 F.3d 1144, 1150 n.6 (6th Cir. 1996) (holding that Health Education Assistance Loans are not dischargeable for failure to graduate from medical school).

9